United States Court of Appeals,

Eleventh Circuit.

No. 96-3682.

SOUTHERN CARD & NOVELTY, INC., Plaintiff-Appellant,

v.

 LAWSON MARDON LABEL, INC. d.b.a. Lawson Mardon Post Card, and Daniel J. Saunders, Defendants-Appellees.

April 7, 1998.

Appeal from the United States District Court for the Middle District of Florida.  (No. 95-130-CVI-ORL-22), Anne C. Conway, District Judge.

Before HATCHETT, Chief Judge,  EDMONDSON and COX, Circuit Judges.

HATCHETT, Chief Judge:

The appellant, Southern Card & Novelty, Inc. (Southern Card), a postcard distributor, challenges the district court's grant of summary judgment for the appellees, Lawson Mardon Label, Inc. (Lawson), a manufacturer of postcards and related products, and Daniel Saunders, the vice-president in charge of Lawson's postcard business, on its federal and state antitrust tying claims. We affirm.

## I. FACTS

Lawson manufactures postcards and sells them to distributors throughout North America.[1] Those distributors then sell the postcards to retail outlets, which in turn sell them to consumers. Over a decade ago, Lawson's predecessor-in-interest, H.S. Crocker Company, Inc. (H.S.Crocker), secured a license agreement with the Walt Disney Company (Disney Company) that permits Lawson to manufacture postcards bearing the copyrighted images of Disney characters such as Mickey

---

[1]Lawson has about an eleven percent market share of the North American postcard business.

Mouse. Although the license agreement is "non-exclusive," the Disney Company has not granted similar rights to any other postcard manufacturer. Thus, Lawson is the sole producer of postcards bearing Disney images. Lawson also makes "local view" postcards, *i.e.,* postcards depicting nonlicensed local images. In Florida, these postcards might present, for example, pictures of beaches, palm trees or alligators. Local view postcards comprise over ninety percent of Lawson's total postcard production and accounted for over sixty percent of its sales in Florida in 1995. The parties do not dispute that at least six other postcard manufacturers produce postcards specific to areas in Florida.

Southern Card, located in Daytona Beach, distributes postcards to retailers—primarily "chain stores"—situated in central and northern Florida. Southern Card purchases its postcards from large commercial printers such as Lawson, and acts as a rack jobber in the stores it services.[2] From 1986—the year Southern Card commenced business dealings with H.S. Crocker—to 1991, Southern Card retained complete control over the quantity and types of postcards that it purchased from the manufacturer.[3] During the late 1980s and early 1990s, Southern Card bought a percentage of its

---

[2]Southern Card asserts that "[t]here are approximately eight main line independent postcard distributors in the state of Florida."

[3]It may well be that in the mid-to-late 1980s, Southern Card and Lawson entered into an informal arrangement whereby Southern Card acted as Lawson's exclusive vendor to chain stores in exchange for Lawson's promise not to sell Disney postcards to Southern Card's competitors. On November 22, 1989, John Nyberg, Southern Card's president, wrote to the chairman of the board of H.S. Crocker, detailing the "history of the relationship" between the two companies. Nyberg wrote that he had "wanted exclusivity on all H.S. Crocker postcard products, including all Walt Disney World items within [Southern Card's] territorial area," and that "[w]ith the understanding that H.S. Crocker would not manufacture for, or sell to any other distributor in the territory serviced by Southern Card & Novelty, our companies began to do business." Nyberg also acknowledged the existence of this arrangement when deposed on April 18, 1996, stating, "So de facto, I became—Southern Card & Novelty became the exclusive vendor to the chain stores. Although there was never any such agreement made between myself and Lawson Mardon, it had indeed evolved that way." However, in an affidavit dated July 30, 1996, Nyberg averred that while the parties had entered into an exclusivity agreement concerning retailers in

local view postcard stock from Lawson's competitors, finding their products superior in terms of price and quality.[4]

In late 1991, Lawson introduced a "Disney Product Plan" in Florida. In a letter dated December 12, 1991, Saunders put forth the terms of the agreement he hoped to reach with Southern Card pursuant to this plan:

> d) Distributor will purchase Local View and General Florida post cards and allied products from [Lawson] equal to his purchases from [Lawson] of Disney products. [For example,] if distributor purchases $100,000 in 1992 of Disney product from [Lawson], distributor agrees to purchase a minimum of $100,000 in 1992 of Local View or General Florida product from [Lawson].

> e) Failure to meet the minimum requirement agreed to in d) above, may result in [Lawson's] decision to not sell any product to distributor in following year.

Because Southern Card feared losing its lone source of Disney postcards, it began buying Lawson's local view postcards in amounts equal to its purchases of Disney postcards.

In October 1993, Saunders wrote to Nyberg expressing his concern that Southern Card continued to buy a significant quantity of postcards from Lawson's competitors. The next month, Saunders wrote to Nyberg asking that Southern Card commit to having Lawson postcards comprise one hundred percent of Southern Card's business in the Orlando area. Southern Card refused, asserting that Lawson already received about seventy-five to eighty percent of its total business, and that it never committed to purchasing one hundred percent of its requirements from Lawson.

A few months later, in February 1994, Lawson began recruiting Southern Card's competitors to sell Lawson postcards to chain stores. The next month, Lawson limited Southern Card's

---

Daytona Beach, they "had no territorial exclusive agreement for Orlando." For purposes of this appeal, we accept this assertion as true.

[4]About seventy percent of Southern Card's revenue is attributable to its sale of local view postcards.

purchases of Disney postcards to those that Southern Card had bought in 1993.[5] In the meantime, Lawson sold a number of Disney postcards that had been developed in 1994 to those distributors that bought only Lawson local view postcards. The district court found, and Southern Card does not dispute, that as a result of these developments, Southern Card "has faced new competition" in retail stores in the Orlando area.

## II. PROCEDURAL HISTORY

Southern Card instituted this lawsuit in February 1995, and its amended complaint asserted federal and state claims of (1) illegal tying pursuant to section 1 of the Sherman Act, 15 U.S.C. § 1, section 3 of the Clayton Act, 15 U.S.C. § 14, and Florida Statutes section 542.18; and (2) monopolization and attempted monopolization under section 2 of the Sherman Act, 15 U.S.C. § 2, and Florida Statutes section 542.19. In outlining its tying claims, Southern Card stated that (1) Disney postcards constituted the "tying" product, and local view postcards were the "tied" product; (2) the "greater Orlando area" constituted the relevant geographic market or sub-market; and (3) the sale of local view postcards to distributors comprised the relevant product market. The crux of the tying claims was that Lawson "illegally compelled and coerced Southern Card and others to agree to purchase [local view postcards] from Lawson ... as a condition of obtaining and retaining access to Disney Cards." Southern Card sought treble damages, injunctive relief and attorneys' fees.[6]

---

[5]Since 1994, Southern Card has continued to purchase these Disney postcards from Lawson but has acquired its entire local view stock from other manufacturers.

[6]Southern Card's expert witness, Dr. Bruce Seaman, subsequently opined that Southern Card had suffered two types of injuries. According to Dr. Seaman, Southern Card "suffered economic damages linked to the overcharge on the tied non-Disney post cards." Also, Lawson's "refusal to allow Southern Card access to a full Disney array of post card products and other types of products has affected and will continue to affect Southern's profits on existing chain store accounts as well as the likelihood that chain store clients will continue to be lost due to the resulting weakening of Southern's relative competitive position."

After the parties conducted extensive discovery, Lawson filed a motion for summary judgment that Southern Card vigorously opposed. In November 1996, the district court granted Lawson's motion. As to Southern Card's federal tying claims, the court first considered whether to deem Lawson's practices unlawful *per se* or subject to evaluation under the rule of reason. The court found that Lawson's practices were "unlike traditional tying arrangements" "because Southern Card does not allege that the ultimate consumer must buy the tied product (a local view postcard) to buy the tying product (a Disney postcard)." The court thus considered the challenged conduct to represent " "full' or "representative' line forcing," that is, a vertical nonprice restraint "undeserving of *per se* treatment." Applying the rule of reason, the court held that Southern Card failed to demonstrate that Lawson had unreasonably restrained competition in the local view postcard market.

Notwithstanding its conclusion regarding the applicability of the rule of reason, the district court also went on to hold that even if it "were to use a *per se* analysis, Southern Card's tying claims would fail" because "the alleged "Disney' and non-Disney classifications are not separate products such that there can be a "tie-in' between them.... Rather, all of Lawson Mardon's postcards are sufficiently unitary to be considered a single product." Next, the court rejected Southern Card's federal monopolization and attempted monopolization claims on the grounds that Southern Card "failed to produce any admissible evidence that creates triable issues of fact with respect to the existence of a cognizable market or Lawson Mardon's monopoly power in such a market." Finally, the court turned away Southern Card's state claims, recognizing that "Florida antitrust law mirrors federal law as applied to the tying, monopolization and attempted monopolization claims in the instant case." On appeal, Southern Card challenges the district court's grant of summary judgment only as to its federal and state tying claims.

III. DISCUSSION

We review the granting of summary judgment *de novo,* applying the same legal standards that bound the district court. *Uniforce Temporary Personnel, Inc. v. National Council on Compensation Ins., Inc.,* 87 F.3d 1296, 1299 (11th Cir.1996). "There is no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen v. United Am. Bank of Cent. Fla.,* 83 F.3d 1347, 1349 (11th Cir.1996).

A.

"A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 462, 112 S.Ct. 2072, 2079, 119 L.Ed.2d 265 (1992) (quoting *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5-6, 78 S.Ct. 514, 518-519, 2 L.Ed.2d 545 (1958)). Such arrangements can run afoul of the Sherman Act's prohibition against agreements "in restraint of trade," 15 U.S.C.A. § 1 (West 1997), and section 3 of the Clayton Act, 15 U.S.C.A. § 14 (West 1997). *See Spartan Grain & Mill Co. v. Ayers,* 581 F.2d 419, 428 (5th Cir.1978) ("The Clayton Act, passed as a response to what Congress considered grudging constructions of the Sherman Act by the courts, specifically bans tying arrangements."), *cert. denied,* 444 U.S. 831, 100 S.Ct. 59, 62 L.Ed.2d 39 (1979). As our predecessor court made clear, the two statutory theories of liability are substantively synonymous. *Bob Maxfield, Inc. v. American Motors Corp.,* 637 F.2d 1033, 1037 (5th Cir. Unit A Feb.1981), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981); *see also* IX Phillip E. Areeda, *Antitrust Law* ¶ 1719b, at 254 (1991) ("Although their words differ, the two

statutes apply a single substantive standard.").[7]

Although the Sherman Act, by its terms, prohibits every agreement "in restraint of trade," this Court has long recognized that Congress intended to outlaw only unreasonable restraints. As a consequence, most antitrust claims are analyzed under a "rule of reason," according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect.

Some types of restraints, however, have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se. Per se* treatment is appropriate once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it. Thus, we have expressed reluctance to adopt *per se* rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.

*State Oil Co. v. Khan,* --- U.S. ----, ----, 118 S.Ct. 275, 279, 139 L.Ed.2d 199 (1997) (internal

quotation marks, citations and brackets omitted). *See also Levine v. Central Fla. Med. Affiliates,*

*Inc.,* 72 F.3d 1538, 1549 (11th Cir.) ("The presumption in cases brought under section 1 of the

Sherman Act is that the rule-of-reason standard applies. We apply the per se rule only when history

and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally

results in a finding of liability, *i.e.,* when the conduct involved always or almost always tends to

restrict competition and decrease output.") (internal quotation marks, citations and brackets omitted),

*cert. denied,* --- U.S. ----, 117 S.Ct. 75, 136 L.Ed.2d 34 (1996).

"[C]ertain tying arrangements pose an unacceptable risk of stifling competition and therefore

are unreasonable "per se.' " *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 9, 104 S.Ct.

1551, 1556, 80 L.Ed.2d 2 (1984). "It is clear, however, that not every refusal to sell two products

---

[7]Because Southern Card does not discuss its state tying claim independently and fails to cite any Florida case law, we assume that federal antitrust doctrine controls that claim as well. *See* Fla. Stat. Ann. § 542.32 (West 1997); *see also Parts Depot Co. v. Florida Auto Supply, Inc.,* 669 So.2d 321, 324 (Fla.App. 4th D.C.A.1996) ("[T]he Legislature has directed courts to rely on comparable federal antitrust statutes in construing [Florida Statutes section 542.18].").

separately can be said to restrain competition." *Jefferson Parish,* 466 U.S. at 11, 104 S.Ct. at 1557. "Thus, in a sense the question whether this case involves "tying' is beside the point. The legality of [Lawson's] conduct depends on its competitive consequences, not whether it can be labeled "tying.' " *Jefferson Parish,* 466 U.S. at 21 n. 34, 104 S.Ct. at 1563 n. 34.

We believe that the terms that Lawson imposed on Southern Card pursuant to its "Disney Product Plan"—that Southern Card purchase local view postcards in amounts equal to its purchases of Disney postcards—are indicative of a manufacturer's "line force" upon a distributor.[8] "Line forcing, be it full or representative, is a vertical nonprice restraint—an agreement between entities at different levels of distribution that does not purport to affect prices charged for the goods." *Smith Machinery,* 878 F.2d at 1295.[9] As the Supreme Court has made clear, "economic analysis supports the view, and no precedent opposes it, that a vertical restraint is not illegal per se unless it includes some agreement on price or price levels." *Business Electronics,* 485 U.S. at 735-36, 108 S.Ct. at 1525-26. This is so because such restraints have the "real potential to stimulate interbrand competition, "the primary concern of antitrust law.' " *Business Electronics,* 485 U.S. at 724, 108 S.Ct. at 1519 (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 51 n. 19, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977)).[10]

---

[8]"Full-line" or "representative-line" forcing occurs when "a manufacturer agrees to license or franchise a dealer to sell its products, but only on condition that the dealer sell a full or representative line of those products." *Smith Machinery Co. v. Hesston Corp.,* 878 F.2d 1290, 1294 (10th Cir.1989), *cert. denied,* 493 U.S. 1073, 110 S.Ct. 1119, 107 L.Ed.2d 1026 (1990).

[9]"Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 730, 108 S.Ct. 1515, 1522, 99 L.Ed.2d 808 (1988).

[10]"Interbrand competition is the competition among the manufacturers of the same generic product.... In contrast, intrabrand competition is the competition between the distributors—wholesale or retail—of the product of a particular manufacturer." *GTE Sylvania,*

As Professor Areeda has written, "requiring dealers to purchase a tied product from the defendant need not impair consumers' purchases from his rivals who sell directly to consumers or who continue to reach them through an ample number of other dealers." IX Areeda, *Antitrust Law* ¶ 1725a, at 317. The Tenth Circuit has similarly stated—in a case involving a distributor's claim that a manufacturer tied the sales of its established, popular farm machinery to sales of its new, unestablished tractors—that

> [i]n a line forcing situation, where a dealer is serving as an intermediate link in a distribution chain, if one manufacturer is foreclosed from selling to a dealer because of the arrangement, it is likely going to find another way to take its product to market, providing a profit potential continues to exist. In such a case, there is no ultimate foreclosure to the consumer of a choice of goods. In other more traditional tying arrangements there is an ultimate foreclosure of choice to the ultimate consumer. Thus, a foreclosure of choice to an ultimate consumer appears to be the principal key to a tie that is illegal per se. No such foreclosure occurs or is threatened in a typical line forcing situation such as that at bar.

*Smith Machinery,* 878 F.2d at 1297 (citing *Jefferson Parish,* 466 U.S. at 5, 104 S.Ct. at 1554; *United States v. Loew's, Inc.,* 371 U.S. 38, 40, 83 S.Ct. 97, 99, 9 L.Ed.2d 11 (1962); *Northern Pac. Ry.,* 356 U.S. at 3, 78 S.Ct. at 517; and *International Salt Co. v. United States,* 332 U.S. 392, 393, 68 S.Ct. 12, 13, 92 L.Ed. 20 (1947)). *See also Roy B. Taylor Sales, Inc. v. Hollymatic Corp.,* 28 F.3d 1379, 1383 (5th Cir.1994) ("Ties that constrain only dealers ... create relatively little danger to competition, provided consumers may purchase the two goods separately.") (footnote omitted), *cert. denied,* 513 U.S. 1103, 115 S.Ct. 779, 130 L.Ed.2d 673 (1995); *Ransomes Am. Corp. v. Spartan Distribs., Inc.,* 914 F.Supp. 183, 185 (W.D.Mich.1996) ("Tying arrangements that constrain only dealers are not presumptively illegal because they pose little danger to competition, as long as consumers may purchase the two goods separately."); *Paul E. Volpp Tractor Parts, Inc. v. Caterpillar, Inc.,* 917 F.Supp. 1208, 1229 (W.D.Tenn.1995) ("Because consumers are not hurt by

---

433 U.S. at 51 n. 19, 97 S.Ct. at 2558.

vertical non-price restraints between manufacturers and dealers, the type of line-forcing/exclusive arrangement found in this case should not be subject to the same *per se* treatment as traditional tying arrangements."). Not surprisingly, then, "most courts dealing with the full-line force have not applied the per se rule against tying but have required proof in the particular case of a significant threat to competition." IX Areeda, *Antitrust Law* ¶ 1725c, at 323.

Southern Card has made no showing that line-forcing arrangements like the one at issue always or almost always tend to restrict competition and decrease output. This fact, coupled with the strength of the authorities cited above, leads us to conclude that it would be inappropriate to deem Lawson's line-forcing practice unlawful *per se.* Thus, we will review the restraint under rule-of-reason analysis.

For the same reasons, Lawson's (unsuccessful) attempt to compel Southern Card to carry only Lawson-produced local view postcards does not require us to employ a different standard.

> The claimed arrangement between [Lawson] and [Southern Card] constituted a vertical nonprice restraint between a manufacturer and a dealer on goods that the dealer offered to customers independently. It was in effect an exclusive-dealing arrangement in which [Lawson] required [Southern Card] to sell [Lawson], and only [Lawson], [local view postcards]. Such an arrangement is not the sort that would always or almost always tend to restrict competition and decrease output. It does not threaten competition to the same extent as tying arrangements that bind ultimate customers. Regardless of whether the restraint also constituted a tying arrangement, subjecting it to per se analysis would ignore our directive from the Court. The measure of legality of relationships between manufacturers and independent distributors must not be allowed to turn on labels.

*Taylor Sales,* 28 F.3d at 1384-85 (internal quotation marks and footnotes omitted).

B.

Under the rule of reason, a plaintiff must prove an anticompetitive effect of the defendant's conduct on the relevant market, and that the conduct has no procompetitive benefit or justification. *Levine,* 72 F.3d at 1551. Southern Card argues that Lawson's behavior generated anticompetitive effects because it (1) foreclosed the market to competitive manufacturers; (2) caused consumers to

pay higher prices;  and (3) resulted in a dilution in product quality and service.  Southern Card thus attempts to prove that Lawson's conduct had an actual detrimental effect on competition.  *Levine,* 72 F.3d at 1551.  We address Southern Card's contentions in turn.

1.

Southern Card asserts that the "record clearly supports the existence of market preclusion of competitive manufacturers of local view cards in the Orlando area."  In support of this contention, Southern Card first argues that Lawson's "specific attack" on the sales base of one of its competitors, John Hinde Curteich & Co. (Hinde), evidences an anticompetitive effect.  In making this argument, Southern Card relies primarily on the affidavit of Hinde vice-president Don Moffet.

Moffet's affidavit, however, does little to advance Southern Card's cause.  Moffet avers that Lawson's practices caused Hinde to lose "some"of its share of the local view postcard market to Lawson.  Moffet also states, however, that as Disney postcards increased in popularity in the late 1980s and early 1990s, Hinde's sales of local view postcards "began to decrease."  We agree with Lawson that Moffet's affidavit is woefully deficient, as it fails to (1) state with any degree of specificity just how much business Hinde lost to Lawson;  (2) describe any competitive actions Hinde took in response to Lawson's practices;  or (3) explain away other potential reasons for Hinde's loss of business.

Unfortunately for Southern Card, none of the other evidence it proffers is even as probative as Moffet's affidavit.[11]  In short, Southern Card has failed to show that Lawson's dealings somehow either precluded other manufacturers from gaining access to the local view postcard market or adversely impacted upon consumer choice.  Thus, we have little difficulty in turning away Southern

---

[11]We reach this conclusion after carefully reviewing the record citations put forth at pages fourteen and forty-one through forty-four of Southern Card's initial brief, and at pages seven through twelve of its reply brief.

Card's contention here. As the Fifth Circuit has stated, "[s]peculation about anticompetitive effects is not enough." *Taylor Sales,* 28 F.3d at 1385.

2.

Southern Card next asserts that as a result of Lawson's practices, "the average price of local view postcards in the Orlando area was significantly higher than in any other part of [Florida]." In support of this assertion, Southern Card relies on a survey that its expert, Dr. Seaman, conducted.[12] Dr. Seaman avers that "[t]he result of the survey was that the average price of non-Disney local view cards in the Orlando area, as sold in gift shops by Scenic Card[ ] [a distributor that purchased all of its local view postcards from Lawson] is $.30, which is ... higher than the average price of $.25 charged in retail outlets served by Southern Card [and another distributor].... The average price of local view post cards in the non-Orlando locations is also approximately $.25...."

Southern Card's evidence is again lacking. As the district court correctly pointed out, the cited price differential "is of little value" because it may result from "the biased sample of local view postcard purchases from Orlando gift and souvenir shops, rather than from lower-cost retail outlets served by Southern Card," or from Dr. Seaman's failure "to factor in differentials in the cost of living (or cost of a vacation) in the various parts of the state." Moreover, Southern Card has not referenced *any* record evidence that enables this court to assess whether Lawson charged disproportionately higher prices for its local view postcards as compared to other manufacturers. In sum, Dr. Seaman's conclusion, standing alone, would not enable reasonable jurors to conclude that Lawson's practices caused consumers to pay more for local view postcards in the Orlando area. Southern Card's purported proof regarding anticompetitive effects thus remains overly speculative.

---

[12]Dr. Seaman surveyed postcard prices at over 200 retail stores located throughout approximately forty different vacation areas in Florida.

3.

Finally, Southern Card argues that Lawson's practices caused a dilution in local view postcard quality and service in the Orlando area. Southern Card, however, fails to present any expert testimony or consumer survey evidence to support this subjective assessment. Instead, Southern Card first refers to a number of internal memoranda from Lawson describing various quality and service difficulties it experienced in its production and delivery of certain postcards. These documents, however, do not address the *relative quality* of Lawson's local view postcards. Southern Card also cites to the deposition testimony of Duncan Page, a president of both a postcard manufacturing company (*i.e.,* a Lawson competitor) and a postcard distribution company, who, not surprisingly, states that he prefers to buy postcards from his own manufacturing company (even though "[t]he pricing is exactly the same as Lawson Mardon") because the "quality of our postcard and our images are better." Southern Card also references the affidavit of Joel Mittelberg, the president of Scenic Florida Distributors, Inc., who states, after noting that he purchases local view postcards from several manufacturers in addition to Lawson, that Lawson's delivery times on new work orders are "generally slower than is standard in the post card industry." The testimony of Page and Mittelberg, without more, certainly does not rise to the level of an anticompetitive effect in the relevant local view postcard market.[13]

## IV. CONCLUSION

For the foregoing reasons, we hold that the district court was correct (1) in evaluating Southern Card's claims under the rule of reason, and (2) in concluding that Southern Card's evidence was insufficient for a reasonable jury to find that Lawson's sales practices generated an

---

[13]Because we conclude that Southern Card has failed to establish a violation of the antitrust laws, we have no occasion to consider Lawson's challenge to Southern Card's standing to bring this lawsuit. *See Levine,* 72 F.3d at 1545.

anticompetitive effect in the relevant market.  Accordingly, we affirm the judgment of the district court.

AFFIRMED.