**GENERAC CORPORATION,**
**Plaintiff–Appellant,**

v.

**CATERPILLAR INC., Defendant–Appellee.**

No. 97–1404.

United States Court of Appeals, Seventh Circuit.

Argued April 16, 1998.

Decided March 30, 1999.

Barry L. Chaet, Kevin L. Keeler (argued), Beck, Chaet, Loomis, Molony & Bamberger, Milwaukee, WI, for Plaintiff–Appellant.

Brian E. Butler (argued), Stafford, Rosenbaum, Rieser & Hansen, Madison, WI, for Defendant–Appellee.

Before FLAUM, RIPPLE, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

From 1992 until 1996, Generac Corporation served as a dealer of certain generators that it manufactured under license from Caterpillar Inc. In June 1996, Caterpillar decided to terminate its agreement with Generac and find a new business partner. Generac fought back with a suit under the Wisconsin Fair Dealership Law ("WFDL"), the Sherman Act, the Wisconsin common law concerning restrictive covenants, and the Illinois Consumer Fraud and Deceptive Business Practices Act. The district court, in two separate orders, disposed of the entire action in Caterpillar's favor. Generac's appeal challenges only the court's rulings under the WFDL, the Sherman Act, and the common law of restrictive covenants. We agree that these claims were properly dismissed and affirm.

## I

Generac is in the business of designing, manufacturing, selling, and supporting generator sets and related parts. Prior to 1992, it sold sets primarily under its own brand name. It distributed these generator sets through a network of 97 distributors, and it earned substantial revenues: in 1991 its sales were $28.5 million, and in 1992 sales reached $38.7 million.

One product Generac sold was an industrial standby generator, which a customer would use to supply power in case the primary source of electricity failed. Caterpillar, which is also in the generator business, was not having much luck in

manufacturing, selling, promoting, or supporting low output range (10 KW to 200 KW) standby generators. Accordingly, many Caterpillar dealers carried Generac standby generators. Of Generac's 97 distributors, 31 in North America and 16 on other continents also handled Caterpillar products.

Caterpillar wanted a presence in the market, however, and it had gotten so far as to procure a trademark for small generators it might manufacture: they were to have the rather grandiose name "Olympian." Hoping to retain its access to Caterpillar dealers and to improve its small generator sales, Generac proposed to Caterpillar that it should serve as Caterpillar's exclusive supplier of small generator sets. This idea was attractive to Caterpillar for the simple reason that Caterpillar had not succeeded in cracking the small generator market on its own.

Since a team effort with Generac seemed to hold promise for both sides, on June 1, 1992, Generac and Caterpillar entered into an agreement that granted Generac rights to develop and manufacture a line of generators that would be marketed under Caterpillar's Olympian trademark; the Olympian generators would be distributed by Caterpillar dealers in specified territories. (The agreement superseded Generac's prior arrangements with Caterpillar dealers, which were either terminated or allowed to expire.) Generac was to handle North, Central, and South America, as well as 17 countries in the Far East. Caterpillar promised not to license anyone else to sell generator sets within Generac's territory under the Olympian trademark, but it was free to sell or license others to sell generators in the Generac territory under a different trademark. With respect to the United States and Canada alone, Generac was permitted to sell Olympian products only to Caterpillar dealers who had been designated by Caterpillar as a Power Systems Distributor ("PSD"). Significantly, because Wisconsin had no PSD, the effect of this clause was

to prohibit Generac from making *any* sales in Wisconsin.

In exchange for the right to use the trademark and access to the Caterpillar distribution network in its territory, Generac agreed not to sell Generac branded generator sets over 30 KW to any Caterpillar dealer worldwide. Generac also promised not to appoint any new distribution outlets for its own branded sets in a Caterpillar dealer's territory, as long as the dealer was adequately covering its sales territory for Olympian sets. Generac was required to pay Caterpillar an "access fee" based on the total amount Generac charged Caterpillar dealers for Olympian products. Generac also had to commit to the eventual use of Caterpillar engines in all diesel powered Olympian generator sets. The agreement also contained a number of provisions relating to product specifications, order processing, sales support, shipment, manufacturing capacity, warranties, confidentiality, record keeping, and so forth.

The agreement was for an indefinite duration and could be terminated by either party without cause upon 24 months' written notice, or with cause upon 120 days' prior notice specifying the reason, provided the other party did not correct matters within the 120–day period. Finally, the agreement contained a choice of law clause stating that it "shall be governed by and construed in accordance with the internal law of the State of Illinois."

Both Generac and Caterpillar were apparently pleased with their agreement at the outset. Generac invested considerable time and money in the new product, and sales were strong. Through June 1996, Generac paid Caterpillar more than $5,600,000 in access fees; it spent about $10,500,000 on sales, service, and warranties to promote and support the Olympian line; and it invested more than $660,000 in the engineering and testing of the line. It constructed a new manufacturing facility in Eagle, Wisconsin, at a cost of $5,420,000, so that it could meet demand. By June

1996, Generac's sales of Olympian products totaled $124,403,400. As a percentage of Generac's own business, the numbers were even more impressive: in 1993 Olympian products were 17.6% of its gross sales; in 1995 they accounted for 22.5%; for the six months ending on June 30, 1996, Olympian products represented about 58% of Generac's total industrial sales.

By that time, Caterpillar had decided it could do without Generac. In a letter dated May 2, 1996, it informed Generac that it was terminating the agreement effective June 30, 1998. The reason, it explained, was because it wanted to focus on its new business relationship with Emerson Electric Company and Emerson's subsidiary, F.G. Wilson Engineering. Believing that it had been the victim of a classic free ride—it invested millions to develop the market for Caterpillar's Olympian line, and now it was to be deprived of the ability to reap the long term benefits—Generac filed this suit, which, as we said, it lost in the district court.

## II

A. Wisconsin Fair Dealership Law

■ The first claim we consider is Generac's argument that Caterpillar violated its rights under the WFDL, Wis. Stat. § 135.01 *et seq.*, when it terminated the distribution agreement. As phrased, however, this question assumes that Wisconsin law applies to this case. Whether or not that is true, and the proper methodology we should follow in answering that question, is the first problem we must address.

In *Diesel Service Co. v. AMBAC International Corp.*, 961 F.2d 635 (7th Cir. 1992), this court, sitting in diversity, concluded that a court must set aside any contractual provisions that address choice of law and see if Wisconsin law applies under the forum's relevant choice of law principles. See *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). We agree that this is the first step, for, if Wisconsin's relevant choice of law principles do not allow for the application of Wisconsin law, Wisconsin law cannot govern the dispute.

More problematically, *Diesel Service* adopted a two-step approach to the choice of law question in WFDL cases, under which the court first analyzed the many factors that a Wisconsin court would use in a general case under authorities such as *Haines v. Mid–Century Insurance Co.*, 47 Wis.2d 442, 177 N.W.2d 328 (1970), and *Heath v. Zellmer*, 35 Wis.2d 578, 151 N.W.2d 664 (1967). Only if that analysis pointed to Wisconsin law, as the court in *Diesel Service* found it did, would a court go on to decide if the criteria of the WFDL were satisfied. The court expressly rejected the plaintiff's argument that the WFDL itself contains a statutory choice of law rule, under which the statute applies to dealerships "situated in this state." 961 F.2d at 637–39, referring to Wis. Stat. § 135.02(2). In coming to this conclusion, it acknowledged that a number of cases had gone straight to the second question, but in those instances it found that no one had made an issue of the broader choice of law inquiry. On the other hand, it cited *Bimel–Walroth Co. v. Raytheon Co.*, 796 F.2d 840 (6th Cir.1986); *Boatland, Inc. v. Brunswick Corp.*, 558 F.2d 818 (6th Cir. 1977); *CSS–Wisconsin Office v. Houston Satellite Systems, Inc.*, 779 F.Supp. 979 (E.D.Wis.1991); and *Process Accessories Co. v. Balston, Inc.*, 636 F.Supp. 448 (E.D.Wis.1986), in support of its approach.

We are always treading on sensitive ground when we work our way through unresolved questions of law in a diversity case. We have a continuing obligation to bring our jurisprudence interpreting the state's law into line with the state's own practice, even if that involves reconsidering earlier decisions. In this instance, we believe that *Diesel Service* does not now reflect the interaction the Wisconsin courts have established between the statutory commands of the WFDL and the general choice of law rules Wisconsin follows. For the reasons explained below, we are there-

fore overruling the part of *Diesel Service* that holds that a court is obliged to undertake a general conflicts analysis before it applies the statutory choice of law rule contained in the WFDL.[1]

We begin with a fresh look at the two Sixth Circuit cases on which *Diesel Service* relied: *Bimel–Walroth* and *Boatland*. In *Boatland*, that court confronted a situation in which a Wisconsin manufacturer and a Tennessee dealer were operating under a contract with a Wisconsin choice of law clause. The Sixth Circuit held that the Tennessee district court was obliged to follow Tennessee choice of law principles to determine which state's substantive law applied. Doing so, the court of appeals concluded that the most significant contacts between the parties occurred in Wisconsin. It was also swayed by the express choice of law clause selecting Wisconsin law, and under those facts it held that the WFDL governed the Tennessee dealer. *Boatland*, however, was decided early in 1977. In the same year, the Wisconsin legislature amended the WFDL to make it clear that the statute simply did not apply unless the dealership was "situated in" Wisconsin. The Sixth Circuit took note of this amendment in its 1986 decision in *Bimel–Walroth*, and it frankly commented that "in *Boatland* we did not recognize the anomoly [sic] of interpreting a Wisconsin legislative enactment for the benefit of a Tennessee dealer in a Tennessee court against the interests of a Wisconsin manufacturer." 796 F.2d at 842. Furthermore, nothing in *Bimel–Walroth* even hints that a court has the duty to undertake a formal choice of law analysis before looking to the language of the WFDL itself. Instead, the court found the Wisconsin law to be inapplicable to a dispute between a Wisconsin manufacturer and an Ohio distributor, and it turned to the arguments the parties had presented under the relevant contract. Thus, nothing from our colleagues in the

Sixth Circuit stands in the way of the approach we take here.

The *Diesel Service* court also relied on a pair of district court decisions from the Eastern District of Wisconsin, *CSS* and *Process Accessories*. Even though these cases do look to Wisconsin's general choice of law rules, in context, they appear only to address the arguments of the parties in the order in which they had been presented. Whether it was necessary to engage in a formal choice of law analysis before determining whether the WFDL applied was not an issue in either case. Even with the added weight *CSS* and *Process Accessories* may have acquired by being cited with approval in an opinion of this court, we find nothing in their factual settings or legal conclusions that supports the cumbersome process *Diesel Service* endorsed.

The strongest support for the result we reach can be found in the Wisconsin Supreme Court's decision in *Bush v. National School Studios, Inc.*, 139 Wis.2d 635, 407 N.W.2d 883 (1987). In that case, the court had to decide whether to enforce a contractual choice of law clause in favor of Minnesota law, where a Minnesota company that ran a school portrait service terminated its northern Wisconsin representative. In deciding whether or not to enforce the clause, the court said not a word about general choice of law analysis. Instead, it looked directly to the WFDL and the statutory language declaring that the law reflects the fundamental policy of the state and that its effect cannot be varied by contract. 407 N.W.2d at 886. It characterized the WFDL as a statute that "make[s] a particular contract provision unenforceable." *Id.* at 887. The leading Wisconsin court of appeals decision on geographical coverage of the law, *Swan Sales Corp. v. Jos. Schlitz Brewing Co.*, 126 Wis.2d 16, 374 N.W.2d 640 (Wis.Ct.App.1985), also turned directly to the statute, when it had

1. This opinion has been circulated to all judges in active service under the provisions of Circuit Rule 40(e). A majority of the members of the Court voted not to hear the matter *en banc*. Judge Manion did not participate in the vote.

to decide whether the WFDL applied to an agreement between Schlitz and Swan under which Swan would distribute Schlitz's beer to American military facilities in a number of foreign countries.

We know of nothing that would prevent the Wisconsin legislature from announcing a particular choice of law rule for dealership cases in duly enacted legislation. That, in fact, is what the legislature has done. The WFDL specifies who can take advantage of its protections through its definitions of the terms "dealer" and "dealership," and thus obviates the need to resort to general choice of law principles. See Wis. Stat. § 135.02. This has been particularly true since 1977 when the legislature added clarifying language to the WFDL further explaining which arrangements are covered and which are not. Moreover, the WFDL's announced purpose "[t]o govern all dealerships ... to the full extent consistent with the constitutions of this state and the United States," Wis. Stat. § 135.025(2)(d), as well as the fact that its protections apply regardless of contractual choice of law, Wis. Stat. § 135.025(3), further suggest that the Wisconsin legislature did not intend general choice of law rules to apply to WFDL claims.

■ The question for Generac and Caterpillar therefore can be stated simply: Is Generac a Wisconsin dealer entitled to the protections of the WFDL, under the statute as authoritatively interpreted by the Wisconsin courts? The WFDL defines the term "dealer" to mean "a person who is a grantee of a dealership *situated in this state*." Wis. Stat. § 135.02(2) (emphasis added). The meaning of the phrase we have emphasized was the question before the Wisconsin court of appeals in *Swan*. That court held:

> [The legislative history of the "situated in" requirement] clearly establishes the legislature's intent to make the WFDL apply exclusively to dealerships that do business within the geographic confines of the state of Wisconsin. Since Swan

only did business for Schlitz overseas, the trial court was correct in determining that this agreement does not come within the terms of the WFDL. The subject matter of this agreement is not "situated in this state."

374 N.W.2d at 644.

■ In this case, the agreement between Generac and Caterpillar, through its language forbidding Generac to make sales in the United States to anyone but a PSD, did not authorize any sales at all in Wisconsin. It is true that the record indicates that Generac made substantial investments in Wisconsin that allowed it to manufacture product for distribution and sale elsewhere, but the logic of *Swan* suggests that this kind of infrastructure, unaccompanied by instate sales, is not enough to bring the dealership under the statute. Swan plainly had substantial Wisconsin operations too, if it was handling beer sales to the American military in a dozen foreign countries, but the court there did not find that support services in Wisconsin made any difference. We conclude, therefore, that the district court correctly ruled in Caterpillar's favor on Generac's WFDL claim.

Before leaving the subject, we pause to note that Generac's lack of Caterpillar sales in Wisconsin would also foreclose any possibility of recovering damages under the WFDL. In *Morley–Murphy Co. v. Zenith Electronics Corp.*, 142 F.3d 373 (7th Cir.1998), this court concluded that the Wisconsin Supreme Court would not construe the WFDL to apply extra-territorially and that therefore a dealer seeking relief under the WFDL cannot recover damages for lost sales arising out of the termination of out-of-state dealerships. Accordingly, even if for some reason the WFDL were to apply to the Generac–Caterpillar relationship, Generac would not be entitled to any relief.

B. Sherman Act

■ On this branch of its case, Generac seeks to persuade us that its agreement with Caterpillar violated § 1 of the Sher-

man Act, as a *per se* illegal horizontal division of the market. See *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curiam); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Both Caterpillar and Generac were selling the Olympian generators that Generac was manufacturing under its license; each had exclusivity over certain territories, at least for purposes of selling the trademarked items; ergo, they had "divided markets" and deserved to be sued by their customers for treble damages.

Unfortunately for the customers, if for no one else, we cannot agree with Generac's characterization of the agreement. The Supreme Court has made it clear for some time now that we should not throw labels like *per se* around loosely, without some appreciation for the economic arrangement we are evaluating. See, *e.g., Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723–31, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988); *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 7–10, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). What stands out prominently from the Generac–Caterpillar agreement is the fact that it involved a transfer of intellectual property rights: the trademark "Olympian." In exchange for the right to use the trademark and for access to Caterpillar's distribution network, Generac agreed to restrict its operations. Even though in some ways the companies may have operated in similar lines of business, this particular agreement was a vertical one in which Generac played the role of "supplier" and Caterpillar both upstream supplier of the trademark, and downstream purchaser of the finished goods.

■ Unlike horizontal agreements, vertical agreements are *per se* illegal under Sherman Act § 1 only if they impose minimum price restraints. See *State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (maximum price restraints not per se illegal); *Business*

*Elecs., supra* (vertical nonprice restraints not *per se* illegal). Vertical non-price restraints, such as the territorial and marketing restrictions at issue in this case, are evaluated under the rule of reason. *Business Elecs.*, 485 U.S. at 723–31, 108 S.Ct. 1515. Accordingly, to prevail, Generac must demonstrate, at a minimum, that its agreement with Caterpillar has an anticompetitive, welfare-reducing effect that is not overcome by any pro-competitive, welfare-enhancing consequences of the agreement. *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir.1982). See *State Oil*, 118 S.Ct. at 279, for a recent description of the rule of reason inquiry.

■ The agreement left Caterpillar free to sell all the generator sets it wanted in the territory covered by the agreement, as long as it did not affix the "Olympian" trademark to them. Furthermore, if Caterpillar exercised this right, Generac was relieved of some of the restrictions on its own activities. This clause alone makes it clear that the agreement could not possibly have led to a restriction in the supply of generator sets. Product markets are not defined in terms of one trademark or another; trademarks simply identify the origin of a product. Not even the most zealous antitrust hawk has ever argued that Amoco gasoline, Mobil gasoline, and Shell gasoline are three separate product markets, yet that absurd result would follow if we recognized Olympian trademarked generator sets as a separate market in this case. *Compare Digital Equip. Corp. v. Uniq Digital Techs., Inc.*, 73 F.3d 756, 763 (7th Cir.1996) (rejecting product market consisting solely of one company's products).

Furthermore, Generac also had considerable flexibility under the agreement to act independently if the Caterpillar dealers were not meeting its needs. Under paragraph 2 of the agreement, Generac promised not to appoint any new distribution outlets for generator sets over 30 KW in a Caterpillar dealer's territory, unless that dealer was not performing satisfactorily.

If there was a problem, the agreement gave the parties four months to work things out to Generac's satisfaction. If those efforts were unsuccessful, Generac could appoint additional dealers for generator sets. Again, no credible story of lowered output or increased price can be told on the basis of these provisions. This was instead a vertical agreement in which both parties restricted their actions somewhat in the interest of more efficient promotion of the covered products and better sales. *Cf. Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188–90 (7th Cir.1985). The district court correctly dismissed Generac's antitrust count.

### C. Restrictive Covenants

Generac complains on appeal that the district court failed to address its state law claim under Count V of the second amended complaint, which charged that the agreement's limitation on Generac's ability to appoint new dealers is an unenforceable restrictive covenant under Wisconsin law. It acknowledges that this doctrine is normally applied to restrictive covenants in employment contracts, such as a doctor's promise to the clinic where she works that she will not leave and establish her own practice across the street without a reasonable hiatus designed to protect the clinic's goodwill and patient lists. Generac, nevertheless, does not cite any Wisconsin decisions finding the type of agreement at issue in this case to be an unenforceable restrictive covenant. In any event, for the same reasons we were not troubled by the limited restriction on Generac's ability to appoint new distributors for purposes of the antitrust claim, we see nothing to indicate that the same restriction would violate Wisconsin law regarding restrictive covenants.

We therefore AFFIRM the judgment of the district court in all respects.