669 So.2d 321 (1996)
PARTS DEPOT COMPANY, L.P., By and Through its general partner PARTS DEPOT COMPANY, INC., Appellant,
v.
FLORIDA AUTO SUPPLY, INC., d/b/a Florida Auto Supply and J.C. Impellitier, individually, Appellees.
Nos. 94-1582, 94-2633.
District Court of Appeal of Florida, Fourth District.
March 13, 1996.
*322 Mark S. Mucci of Benson, Moyle & Chambers, Fort Lauderdale, and Irene C. Keyse-Walker of Arter & Hadden, Cleveland, Ohio, for appellant.
G. Ware Cornell, Jr., of G. Ware Cornell, Jr., P.A., Fort Lauderdale, for appellees.
WARNER, Judge.
When the appellant sued the appellee for nonpayment on an account, the appellee, Florida Auto Supply, counterclaimed against the appellant, Parts Depot, for antitrust violations, alleging that Parts Depot, a warehouse distributor of auto parts, and Vero Beach Auto Parts, an auto parts "jobber," conspired to damage Florida Auto Supply as a competitor of Vero Beach Auto Parts. On the first day of trial, the trial court allowed the appellee to amend its counterclaim alleging that others conspired with Vero Beach Auto Parts in further violation of antitrust laws. After trial on the merits, the jury returned a verdict in favor of the appellee. Because we find that the appellee did not prove either a horizontal or vertical conspiracy in restraint of trade, we reverse.
In April 1989, J.C. Impellitier opened Florida Auto Supply as an independent jobber in Vero Beach after years of working at Bennett Auto Supply (Bennett), a chain of auto parts stores. Ben Clair, Inc., the warehouse distributor arm of Bennett, supplied Florida Auto Supply with start-up inventory in exchange for cash and a promissory note, which was secured by a lien on the inventory. Shortly thereafter, Steego Parts Corporation (Steego) began supplying Florida Auto Supply with auto parts and offered overnight delivery.
In the auto parts business, most orders from garages are placed with a distributor in the morning. Most parts warehouses offer same day delivery of morning orders to the distributors who can then deliver to the garages. If an order comes in after 9:30 a.m., the "same day" warehouse deliveries cannot fill the order that day and must deliver the next day, but the delivery would not arrive until the afternoon. Overnight delivery allows orders placed in the afternoon to arrive at the distributor before the morning, so that the part is available when the garage opens up. Steego offered this service as a way of *323 attracting customers. When Florida Auto Supply obtained overnight delivery, it marked up its price to its customers by 50 percent. There was no testimony as to the amount of Florida Auto Supply's mark-up on same day service.
In November 1989, Steego sold its assets to Parts Depot, including the account receivable from Florida Auto Supply. On December 15, 1989, the manager of Parts Depot informed Florida Auto Supply that it would no longer do business with Florida Auto Supply. According to Impellitier, this came out of the blue. A day or two later, Impellitier phoned Don Thompson of Parts Depot, a friend of Impellitier, and asked him to look into the termination. Thompson was informed by the Parts Depot president that some independent jobbers had complained that Parts Depot was selling to a Bennett store, thus hurting Parts Depot's independent jobber customers. Thompson told the Parts Depo president that Florida Auto Supply was not a Bennett store and suggested that this could be proven by checking to see if Ben Clair, Inc. or Bennett had filed a UCC lien to protect their inventory. There was a UCC statement on file from Ben Clair. Thompson called Impellitier and told him that because Ben Clair held a UCC lien on Florida Auto Supply, they believed Florida Auto Supply was a Bennett store, even though denied by Florida Auto Supply.
Impellitier testified that being cut off from overnight delivery hurt his business reputation, causing economic problems. For a while in 1992, he found another overnight supplier but that supplier opened its own store in the Vero Beach area and stopped supplying him. He admitted that overnight delivery could be provided by United Parcel Service (UPS), but that service was expensive and would put him at a competitive disadvantage with other retailers.
Vero Beach Auto Parts continued to be serviced by Parts Depot. It was owned by the son of the president of Parts Depot, with a minority share being held by the president. One of Florida Auto Supply's employees testified that he had heard the son state that he would drive Florida Auto Supply out of business. Yet Florida Auto Supply and Vero Beach Auto Parts continued to do business with each other, buying available parts from each other as needed. There were also other jobbers in Vero Beach, some of whom were served by Parts Depot. Three customers of Florida Auto Supply testified that while they used Florida Auto Supply for most of their purchases because it had the lowest prices, they went to other jobbers when they wanted overnight delivery. This was for customer convenience, however, not because of price. Two of the customers testified that they used Vero Beach Auto Parts, and one testified that he used Kirby Auto Parts, when overnight delivery was required. None testified that overnight service was more expensive as a result of Florida Auto Supply's departure from that segment of the market.
In response, the president of Parts Depot testified that the decision not to sell to Florida Auto Supply was prompted by the existence of the UCC filing statement on the inventory of the store. Parts Depot had experienced a competitor removing inventory of one of its customers based on a UCC lien, thereby threatening Parts Depot's security interest on its own account with that customer. Since Ben Clair had filed a UCC lien on Florida Auto Supply's inventory, Parts Depot did not want to be placed in a financially insecure position with a customer again. The president of Parts Depot denied that his decision to refuse Florida Auto Supply an account was because it was in competition with Vero Beach Auto Parts.
Other than the testimony of Thompson that the president of Parts Depot had stated that some independent jobbers had complained about Parts Depot's supplying to Florida Auto Supply, there was no testimony from any independent jobber about any complaints, threats, or agreements with Parts Depot.
The jury returned a verdict for Florida Auto Supply for $28,000, which the trial court trebled pursuant to section 542.22, Florida Statutes (1989). From the final judgment, the appellant takes this appeal.
The appellant claims that the trial court erred in denying the motion for judgment in accordance with its prior motion for *324 directed verdict, because the appellee failed to prove its case. In ruling on the motion, all evidence must be construed, and all inferences drawn, in the light most favorable to the non-moving party. See, e.g., Collins v. School Bd. of Broward County, 471 So.2d 560, 563 (Fla. 4th DCA 1985), writ dismissed, 491 So.2d 280 (Fla.1986). Nevertheless, "`[t]he jury's role as the finder of fact does not entitle it to return a verdict based only on confusion, speculation or prejudice; its verdict must be reasonably based on evidence presented at trial.'" H.L. Moore Drug Exch. v. Eli Lilly & Co., 662 F.2d 935, 941 (2d Cir.1981) (quoting Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1042 (2d Cir.), cert. denied, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976)), cert. denied, 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982).
While the appellee sued under section 542.18, Florida Statutes (1989), which prohibits conspiracies in restraint of trade, the Legislature has directed courts to rely on comparable federal antitrust statutes in construing this statute. § 542.32, Fla.Stat. (1989). Therefore, we look to federal cases to elucidate what is an agreement in restraint of trade and what proof constitutes a conspiracy.
Case law has categorized restraints on competition as being either vertical or horizontal:
"Vertical" restraints upon competition are those imposed by persons or firms on a different level of the distribution system than the level of the persons or firms receiving the impact of the restraints, e.g., resale price fixing may involve a manufacturer dictating the price at which a dealer sells a product. On the other hand, "horizontal" restraints are those imposed within the same distribution level, e.g., by some dealers refusing to sell to other dealers.
St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc., 457 So.2d 1028, 1031 (Fla. 2d DCA 1984). Horizontal restraints also encompass the situation where dealers conspire to induce the manufacturer to refuse to deal with a particular dealer. Id. at 1040.
In "distributor-termination cases" concerning vertical restraints, the Supreme Court has established several important distinctions.
First there is the basic distinction between concerted and independent actiona distinction not always clearly drawn by parties and courts. Section 1 of the Sherman Act requires that there be a "contract, combination ... or conspiracy" between the manufacturer and other distributors in order to establish a violation. 15 U.S.C. § 1. Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently....
The second important distinction in distributor-termination cases is that between concerted action to set prices and concerted action on nonprice restrictions. The former have been per se illegal since the early years of national antitrust enforcement. The latter are judged under the rule of reason, which requires a weighing of the relevant circumstances of a case to decide whether a restrictive practice constitutes an unreasonable restraint on competition.
Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775, 783-84 (1984) (citations omitted).
In the instant case, the appellee has alleged both a vertical and a horizontal conspiracy. Neither have been proven in accordance with antitrust law.
The allegations which form the basis for the horizontal conspiracy or group boycott consist of the complaints by other jobbers, none of whom were named, that Parts Depot was selling to a Bennett store. A manufacturer's mere receipt of complaints from its wholesalers or agents who compete with the plaintiff, standing alone, does not constitute a conspiracy. H.L. Moore Drug Exch., 662 F.2d at 941; Oreck Corp. v. Whirlpool Corp., 639 F.2d 75, 80 (2d Cir. 1980), cert. denied, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981).
Even where a termination follows the receipt of complaints from wholesalers or agents, there is no basis for inferring the *325 existence of concerted action, absent some other evidence of a tacit understanding or agreement with them. Finally, the mere fact that a business reason advanced by a defendant for its cut-off of a customer is undermined does not, by itself, justify the inference that the conduct was therefore the result of a conspiracy. Even if a manufacturer or supplier, acting independently, gave a false or inaccurate reason for its action, whether because of a desire to avoid controversy or some other consideration, this would not violate any legal obligation to the customer, absent proof of a conspiracy or breach of contract.
H.L. Moore Drug Exch., 662 F.2d at 941 (citations omitted).
In the instant case, the only evidence of a horizontal conspiracy was the testimony of Thompson that a few jobbers complained that Parts Depot was selling to a Bennett store. There were no threats or allegations of concerted action between Parts Depot and these unnamed jobbers. Under H.L. Moore Drug Exchange, the evidence was insufficient to prove a conspiracy. Moreover, while the appellee sought to demonstrate that the appellant's alleged business reason for cutting off Florida Auto Supplythe UCC lien filed against its inventorywas not credible due to discrepancies in the testimony of the president of Parts Depot, even if the business reason given for terminating the appellee was undermined, it still does not justify an inference that a conspiracy occurred absent some proof of that conspiracy. Id. Thus, what we have are two evidentiary facts, neither of which can circumstantially prove, either alone or considered together, that a conspiracy occurred.
The policy reason for why this conduct does not constitute a conspiracy in violation of antitrust laws has been expressed by the Supreme Court in Monsanto:
Permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about "in response to" complaints, could deter or penalize perfectly legitimate conduct. As Monsanto points out, complaints about price-cutters "are naturaland from the manufacturer's perspective, unavoidable reactions by distributors to the activities of their rivals." Such complaints, particularly where the manufacturer has imposed a costly set of nonprice restrictions, "arise in the normal course of business and do not indicate illegal concerted action." Moreover, distributors are an important source of information for manufacturers. In order to assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities to assure that their product will reach the consumer persuasively and efficiently. To bar a manufacturer from acting solely because the information upon which it acts originated as a price complaint would create an irrational dislocation in the market. In sum, "[t]o permit the inference of concerted action on the basis of receiving complaints alone and thus to expose the defendant to treble damage liability would both inhibit management's exercise of independent business judgment and emasculate the terms of the statute." Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111, n. 2 (CA3 1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).
465 U.S. at 763-64, 104 S.Ct. at 1470 (citations and footnote omitted).
Instead of a group boycott, the proof shows two conspirators, Parts Depot and Vero Beach Auto Parts. Because these companies are on different functional levels in the distribution scheme, this at best would be a vertical conspiracy, not a horizontal one. Only vertical conspiracies to set prices constitute per se violations of antitrust laws. Monsanto, 465 U.S. at 761, 104 S.Ct. at 1469. Other violations are governed by the "rule of reason," which requires the plaintiff to prove that a restrictive practice constitutes an unreasonable restraint on competition. Id. The appellee produced no evidence on this issue. It did not show what the net economic effect of its removal from the "overnight delivery of auto parts" market had on the availability or price of overnight delivery in Vero Beach. See, e.g., Oreck Corp. v. Whirlpool Corp., 579 F.2d 126, 128 (2d Cir.), cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978). Instead, it showed what *326 effect Parts Depot's refusal to sell to Florida Auto Supply had on its financial picture. That is not sufficient. Antitrust laws are for the protection of competition, not for the protection of individual competitors. See St. Petersburg Yacht, 457 So.2d at 1047.
In this case, the restraint was Parts Depot's termination of Florida Auto Supply thus eliminating it from its overnight service. Because non-price vertical restraints are governed by the rule of reason, in order to prove a violation, a plaintiff must show that the action actually amounted to an unreasonable restraint on competition. St. Petersburg Yacht, 457 So.2d at 1035-1036. "Under [the rule of reason], the fact-finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568, 580 (1977).
Three elements must be alleged and proved under the rule of reason test: 1) that there is a specifically defined market; 2) that the defendants possessed the ability to affect price or output; and 3) that plaintiff's exclusion from the market did affect or was intended to affect the price or supply of goods in that market. Greenberg v. Mount Sinai Medical Ctr., 629 So.2d 252, 257 (Fla. 3d DCA 1993). "It is not enough to allege that plaintiffs were injured; there must be an allegation of harm to competition in general." Id.
Although the appellee alleged a harm to the market, there was no proof of it. The evidence showed that while Florida Auto Supply was unable to deliver parts overnight, its customers were still able to obtain such service from at least two sources (Vero Beach Auto Parts and Kirby Auto Supply). Moreover, Florida Auto Supply itself could have delivered overnight service by using UPS. It chose not to because it was too costly to use. However, the fact that Florida Auto could not deliver the service as cheaply as others is not evidence of harm to the market. "The antitrust laws are not intended to support artificially firms that cannot effectively compete on their own. It is only when the market is being distorted by anticompetitive conduct that the antitrust laws should be invoked." Seagood Trading Corp. v. Jerrico, Inc., 924 F.2d 1555, 1573 (11th Cir.1991). Here there was no proof that prices were higher as a result of Florida Auto Supply's failure to compete in the market or that the supply was diminished. Thus, there was no evidence from which a jury could find harm to the market. Harm to Florida Auto Supply is not equated with harm to the market actionable under the antitrust laws.
For the foregoing reasons, we hold that the trial court erred in denying the motion for judgment notwithstanding the verdict. There was no evidence of a horizontal conspiracy, and as to the alleged vertical conspiracy there was no evidence of any distortion in the market caused by Parts Depot's refusal to sell to Florida Auto Supply. We therefore reverse and remand for a judgment in favor of the appellant on the counterclaim. For the same reasons, we also reverse the award of attorney's fees in favor of the appellee in the consolidated appeal.
GLICKSTEIN and STONE, JJ., concur.