CIKLIN, J.
MYD Marine Distributor, Inc. and two affiliated companies[1] (collectively referred to as “MYD”) appeal the trial court’s final order dismissing their antitrust claims with prejudice for failure to state a cause of action. Because we conclude that the amended complaint sufficiently alleges antitrust claims, we reverse.
MYD, as a distributor of marine paint and related products, purchases the paint and other goods it distributes from manufacturers and resells them to yacht builders, boatyards, and other customers who use marine paint in their businesses. Until it was terminated in November 2008, MYD was a distributor of Awlgrip topside yacht paint.[2] The appellees, International Paint Ltd. and International Paint LLC (collectively referred to as “International Paint”), manufacture Awlgrip paint.
In December 2008, MYD filed suit against International Paint and two competing Awlgrip distributors — Donovan Marine, Inc. (“Donovan”) and East Coast Marine Distributors, Inc. d/b/a Gold Coast Marine Distributor (“Gold Coast”). In its complaint, MYD asserted claims under the state antitrust laws of Florida, California, and Maryland respectively. After its initial complaint was dismissed for failure to state a cause of action, MYD filed an amended complaint. The defendants again moved to dismiss.
In its amended complaint, MYD alleged that it was the largest distributor of Awl-grip paint in North America and that it consistently sold “its products at significantly lower prices than the prices charged by its competitors.” MYD then claimed that several competing distributors of Awl-grip paint (including Donovan and Gold Coast) conspired with one another and with International Paint to “eliminate the *45 competitive threat posed by MYD’s discounting and to raise prices to the levels charged by the conspiring distributors.”
MYD next described specific instances where the “unlawful conspiracy” had been “either acknowledged or carried out by members of the conspiracy in the presence of witnesses.” The paragraph of the amended complaint which is relevant to the defendant distributors in this case read in pertinent part:
Michael Sharrow of Donovan and Joel Mains of Gold Coast jointly met with Ken Hiekling, then Global Manager of the Awlgrip division of International Paint, at the Fort Lauderdale Boat Show.... Mr. Sharrow is a manager of Donovan and Mr. Mains is a principal and owner of Gold Coast. Donovan and Gold Coast are competitors of one another and of MYD. During the meeting, Mr. Mains and Mr. Sharrow vociferously complained that MYD was “ruin[ing] the Awlgrip market” by undercutting their prices on Awlgrip products.... During this meeting, Mr. Sharrow and Mr. Mains jointly asked Mr. Hiekling either (i) to coerce MYD into raising its Awl-grip prices or (ii) if MYD refused to raise its prices, to terminate MYD as an Awlgrip distributor. Mr. Hiekling agreed to do so, thereby forming a three-way agreement among International Paint, Gold Coast and Donovan. When the three-way meeting ended, Mr. Del Monico [ (MYD’s owner) ] approached Mr. Hiekling and introduced himself. Mr. Hiekling responded by saying: “So you’re the fellow that Donovan and Gold Coast say ruined the Awl-grip market.” ... Mr. Hiekling then asked Mr. Del Monico to raise MYD’s profit margins to at least 25%. Mr. Del Monico stated that Mr. Hiekling’s request was against U.S. law, to which Mr. Hiekling replied: ‘Well, I’m not an American, am I?”
MYD also alleged that representatives from International Paint had admitted on multiple occasions that it was “under intense pressure from MYD’s competitors either to get MYD to raise its prices on Awlgrip products or to terminate MYD as an Awlgrip distributor.” These factual allegations included the names of the people who made the comments, those who heard them, and in many instances the dates on which they occurred.
The amended complaint also described a series of actions allegedly taken by International Paint to coerce MYD into raising its prices including: 1) requesting on several occasions that MYD raise its prices to levels charged by other distributors; 2) threatening to delay shipments of orders to MYD; 3) spreading false rumors that MYD was in serious financial difficulty; and 4) shipping defective product to MYD and then falsely telling MYD’s customers who bought the defective product that it had informed MYD of the problem, but MYD resold the paint regardless. Ultimately, according to the amended complaint, when these coercive efforts failed, International Paint terminated MYD as an Awlgrip distributor. MYD also alleged statements made by International Paint representatives admitting that MYD’s discount pricing was the reason for its termination.
After hearing arguments on the motions, the trial court granted the motions to dismiss MYD’s amended complaint. When MYD subsequently advised the trial court that it did not intend to further amend its antitrust claims, the trial court entered a final judgment in favor of International Paint, Donovan, and Gold Coast. This appeal followed.
A dismissal for failure to state a cause of action is reviewed de novo. Wells v. Wells, 24 So.3d 579, 582 (Fla. 4th DCA *46 2009). “A motion to dismiss for failure to state a cause of action admits all well pleaded facts as true, as well as reasonable inferences that may arise from those facts.” Id. (emphasis added) (citation and quotation marks omitted).
MYD sued International Paint, Donovan, and Gold Coast for violations of the Florida Antitrust Act of 1980.[3] See § 542.15, Fla. Stat. (2005). Pursuant to section 542.18, Florida Statutes, “[e]very contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful.” The Florida Legislature has indicated that its intent is for courts that are construing the Florida Antitrust Act to give “due consideration and great weight ... to the interpretations of the federal courts relating to comparable federal antitrust statutes.” See § 542.32, Fla. Stat. (2005). Therefore, we “look to federal cases to elucidate what is an agreement in restraint of trade and what proof constitutes a conspiracy.” Parts Depot Co. v. Fla. Auto Supply, Inc., 669 So.2d 321, 324 (Fla. 4th DCA1996).
In a distributor-termination case, there must be concerted action (“contract, combination, or conspiracy”) between the manufacturer and other distributors to establish an antitrust violation. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (discussing requirements for the comparable § 1 of the Sherman Act).
In Monsanto, the United States Supreme Court explained:
Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Under Colgate, the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer’s demand in order to avoid termination.
Id. (citation omitted). Thus, “[a] manufacturer’s mere receipt of complaints from its wholesalers or agents who compete with the plaintiff, standing alone, does not constitute a conspiracy.” Parts Depot, 669 So.2d at 324. There must also be “some other evidence of a tacit understanding or agreement.” Id. at 325.
Although Monsanto and Parts Depot involved the legal standard for analyzing what constitutes a reasonable inference when considering a motion for a directed verdict, the same standard is applicable in evaluating the sufficiency of an antitrust claim where, as may often be the case in distributor-termination cases, the plaintiffs conclusion of concerted action is based on inferences from the alleged facts. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (“In identifying facts that are suggestive enough to render a § 1 conspiracy
*47 plausible, we have the benefit of ... prior rulings....”).[4] Accordingly, a pleading which merely asserts complaints to the manufacturer by competing dealers followed by termination of a discounter would be insufficient to create a “reasonable inference” of a conspiracy.
In this case, however, MYD has pled much more than just mere complaints followed by termination. MYD alleged an exact place where the conspiracy was formed and the actual representatives from each of the defendants who participated in the agreement. It pled that representatives from Donovan and Gold Coast arranged to meet jointly with a representative from International Paint at a Fort Lauderdale boat show. According to the amended complaint, the representatives “jointly asked” International Paint to force MYD to raise its prices and to terminate MYD as an Awlgrip distributor if MYD refused. MYD also alleged that International Paint agreed to do so, and that immediately after the meeting with the competing distributors, International Paint’s representative asked MYD’s principal to raise MYD’s profit margins to at least 25%. The allegation that International Paint requested that MYD raise its prices immediately after the joint meeting with the competing distributors places International Paint’s demand “in a context that raises a suggestion of a preceding agreement.” See Twombly, 550 U.S. at 557, 127 S.Ct. 1955.
Even if the above facts were insufficient, MYD also alleged an additional fact which when viewed in the light most favorable to it, further supports the allegation that an agreement was reached. MYD alleged that its owner responded to International Paint’s request that MYD raise its prices by telling International Paint’s representative that the request was against U.S. law. The representative’s alleged response was, “Well, I’m not an American, am I?” A reasonable inference from International Paint’s response is that International Paint admitted that its conduct was in violation of U.S. antitrust law. Independent action by International Paint, however, would not be illegal. Thus, the response could be reasonably interpreted as an admission that International Paint’s request that MYD raise its prices was made pursuant to the alleged agreement with Donovan and Gold Coast.
*48 To survive a motion to dismiss, MYD could not merely plead that an agreement was reached. See Okeelanta Power Ltd. P’ship v. Fla. Power & Light Co., 766 So.2d 264, 267 (Fla. 4th DCA 2000) (“[T]he party must plead sufficient facts to establish each element and cannot use terms which are conclusory.” (emphasis added)). MYD also had to allege that the agreement was an unreasonable restraint on competition. See Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007) (“[T]he Court has repeated time and again that § 1 outlaw[s] only unreasonable restraints.” (citation and quotation marks omitted)); Parts Depot, 669 So.2d at 325. The factual allegations required to plead that an agreement unreasonably restrains competition depends on whether the agreement is categorized as vertical or horizontal.[5]
A horizontal agreement exists where distributors conspire to induce a manufacturer to refuse to deal with a particular distributor. Parts Depot, 669 So.2d at 324. “Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are per se unlawful.” Texaco Inc. v. Dagher, 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006); see also United States v. General Motors Corp., 384 U.S. 127, 145, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) (“Elimination, by joint collaborative action, of discounters from access to the market is a per se violation of the [Sherman] Act.”).
Here, the factual allegations in MYD’s amended complaint suggest that Donovan and Gold Coast conspired to induce International Paint to refuse to deal with MYD. MYD further alleged that this concerted action by Donovan and Gold Coast was done to protect themselves from price competition by MYD. Thus, the alleged conduct was a per se violation of the Florida Antitrust Act. See Texaco Inc., 547 U.S. at 5, 126 S.Ct. 1276; General Motors, 384 U.S. at 145, 86 S.Ct. 1321. As such, MYD was not required to plead any additional facts to show that the alleged agreement between Donovan and Gold Coast would have anticompetitive effects.
MYD also claims that its allegation that International Paint agreed to the demands of Donovan and Gold Coast made it a participant in the horizontal conspiracy, and as such International Paint’s conduct was also per se unlawful. We disagree.
In Leegin, the United States Supreme Court explained:
A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, per se unlawful. To the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful under the rule of reason.
*49 551 U.S. at 893, 127 S.Ct. 2705 (emphasis added) (internal citation omitted). MYD has alleged that International Paint agreed to set a minimum resale price (gross profit margins of at least 25% which is a 33% markup) in order to help the horizontal cartel to increase average retail prices of Awlgrip paint. Thus, according to Leegin, International Paint’s participation created a vertical agreement between International Paint and the cartel and should be analyzed under the rule of reason.
The rule of reason “requires the plaintiff to prove that a restrictive practice constitutes an unreasonable restraint on competition.” Parts Depot, 669 So.2d at 325. Under Florida law, “[t]hree elements must be alleged ... under the rule of reason test: 1) that there is a specifically defined market; 2) that the defendants possessed the ability to affect price or output; and 3) that plaintiffs exclusion from the market did affect or was intended to affect the price or supply of goods in that market.” Id. at 326.
MYD alleged the three required elements in its amended complaint. According to the amended complaint, the relevant product market was topside yacht paint, which was defined as “paint and other related coatings used to paint pleasure boats above the water line.” MYD further alleged that “[t]opside yacht paint is not reasonably interchangeable with other types of marine paint, such as paint used on commercial vessels (e.g., tugboats and barges) or bottom paint (also known as anti-fouling paint) used on pleasure boats.” The amended complaint also stated that the relevant geographic markets depended on the size of the customers. For large customers such as yacht manufacturers, the relevant geographic market was the entire United States. For smaller accounts, the relevant geographic market was regional with the relevant regional markets relevant to this case being South Florida, the mid-Atlantic, Southern California, Northern California, and the Pacific Northwest. Thus, MYD alleged “enough information in [its] complaint to [reasonably] suggest the contours of the relevant geographic and product markets.” See Jacobs v. Tempur-Pedic Int’l, Inc., 626 F.3d 1327, 1336 (11th Cir.2010).
MYD also alleged that International Paint possessed the ability to affect price or output in this specifically defined market. According to the amended complaint, International Paint had “market power— the ability to raise prices above competitive levels without losing sufficient sales to make the price increase unprofitable — in each of the relevant markets.” MYD supported its contention with the following factual allegations: (1) Awlgrip paint has a market share above 80% in the topside yacht paint market; and (2) International Paint “earns supracompetitive margins on Awlgrip paint.”
To show that MYD’s exclusion from the relevant market did affect or was intended to affect the price or supply of goods in that market, MYD alleged that it was the largest distributor of Awlgrip paint in North America and that it consistently sold its products “at significantly lower prices than the prices charged by [its] competitors.” Thus, MYD’s termination as an Awlgrip distributor resulted in the removal of a significant discounter from the market. MYD also alleged that Awl-grip had a sufficiently dominant position that customers continued to buy Awlgrip at higher prices after MYD was terminated rather than substituting other brands of topside yacht paint.
Thus, MYD’s amended complaint contains sufficient factual allegations to properly plead that the vertical agreement between International Paint and the competing distributors was an unreason *50 able restraint on competition. Therefore, the trial court erred in granting International Paint’s motion to dismiss MYD’s antitrust claims for failure to state a cause of action.
The other two points on appeal raised by MYD have been carefully considered and found to be either without merit or not yet ripe for appellate review. Because MYD’s amended complaint contains sufficient factual allegations to properly plead antitrust claims, we reverse the trial court’s orders granting the motions to dismiss the amended complaint against International Paint, Donovan, and Gold Coast.

Reversed and remanded for further proceedings consistent with this opinion.

MAY, C.J., and STEVENSON, J„ concur.

. In the appellate briefs, the parties treat these three companies as a single entity; thus, for simplicity, the appellants are collectively referred to in this opinion as the singular "MYD.”

. In its amended complaint, MYD defines topside yacht paint as "paint and other related coatings used to paint pleasure boats above the water line.”

. MYD also sued for violations of California and Maryland antitrust laws. Because those laws are, in relevant part, substantially similar to the Florida antitrust law and to the equivalent § 1 of the federal Sherman Act the analysis in terms of stating a cause of action in a Florida civil court, is the same under any of the three states’ laws. See 15 U.S.C. § 1 (“Every contract, combination ..., or conspiracy, in restraint of trade or commerce ... is declared to be illegal.’’); § 542.18, Fla. Stat. (2009) ("Every contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful.”); Cal. Bus. & Prof'I. Code §§ 16720, 16726 (West 2009); Md.Code Ann., Com. Law § 1 l-204(a) (West 2009) (“A person may not ... [b]y contract, combination, or conspiracy with one or more other persons, unreasonably restrain trade or commerce. ...”).

. In Twombly, the United States Supreme Court addressed the question of what "a plaintiff must plead in order to state a claim under § 1 of the Sherman Act.” 550 U.S. at 554-55, 127 S.Ct. 1955. The Court concluded that to state such a claim, the “[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).” Id. at 555, 127 S.Ct. 1955 (citations and footnote omitted). The Court further explained that the complaint must contain “enough factual matter (taken as true) to suggest that an agreement was made” and “allegations plausibly suggesting (not merely consistent with) agreement.” Id. at 556-57, 127 S.Ct. 1955. The Court then looked to case law and commentary involving other stages of antitrust trials (such as summary judgments and directed verdicts) to determine if the alleged conduct in that case (parallel conduct by competing companies) was sufficient.
While we are not bound by the United States Supreme Court's interpretation of the Federal Rules of Civil Procedure, we have been instructed by our legislature to give "due consideration and great weight ... to the interpretations of the federal courts” in interpreting Florida’s antitrust statutes. See § 542.32, Fla. Stat. Furthermore, we note that we have looked to federal cases in the past to guide us in analyzing the sufficiency of Florida antitrust complaints. See, e.g., Okee-lanta Power Ltd. P'ship v. Fla. Power & Light Co., 766 So.2d 264, 267 (Fla. 4th DCA 2000). As such, we believe that Florida courts should look to Twombly in determining whether an agreement in violation of the Florida Antitrust law can be reasonably inferred from the alleged facts.

. In Parts Depot, we explained the distinction between vertical and horizontal restraints:
"Vertical” restraints upon competition are those imposed by persons or firms on a different level of the distribution system than the level of the persons or firms receiving the impact of the restraints, e.g., resale price fixing may involve a manufacturer dictating the price at which a dealer sells a product.
On the other hand, "horizontal” restraints are those imposed within the same distribution level, e.g., by some dealers refusing to sell to other dealers. Horizontal restraints also encompass the situation where dealers conspire to induce the manufacturer to refuse to deal with a particular dealer.
669 So.2d at 324 (citation omitted).