# FIFTH DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

_____

Case No. 5D2026-0128
LT Case No. 2025-014323-CICI

_____

NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION,

    Appellant,

    v.

DOCTOR BRADLEY,

    Appellee.

_____

Nonfinal appeal from the Circuit Court for Volusia County.
Dennis P. Craig, Judge.

James A. McKee, of Foley & Lardner LLP, Tallahassee, and
Kevin Fowler, of Foley & Lardner LLP, Orlando, for Appellant.

Carol A. Yoon, of Doran, Foxman, Sims, Wolfe & Yoon, Daytona
Beach, for Appellee.


March 6, 2026


MAKAR, J.

The National Collegiate Athletic Association ("NCAA")
appeals the trial court's issuance of a temporary injunction
granting Doctor Bradley a waiver to compete in the 2025–2026
men's basketball season for Bethune-Cookman University

("BCU"). At the heart of this appeal is the NCAA's "Five-Year Rule," which requires college athletes to complete their four seasons of eligibility within a five-year period. Because the trial court's order is facially deficient and is not supported by competent substantial evidence, we quash the temporary injunction and reverse.

## I.

Over the six prior college basketball seasons, Bradley was rostered on the following schools' teams: California State Fullerton, where he redshirted[1] during the 2019–20 season and received a Covid-19 waiver for the 2020–21 season; Salt Lake City Community College, where he played during the 2021–22 season; New Mexico State University ("NMSU"), where he played during the 2022–23 season until NMSU canceled the school's season mid-year after teammates reported hazing to the police[2]; Nicholls State University ("Nicholls State"), where he transferred during the 2023–24 season until Bradley left the team due to complications stemming from the hazing incident at NMSU; and the University of Arkansas at Pine Bluff ("UAPB"), where he played during the 2024–25 season.

After his season at UAPB, Bradley transferred to BCU, hoping to be eligible for the 2025–26 basketball season. On May 27, 2025, BCU applied, on Bradley's behalf, to the NCAA for a

---

[1] A "redshirt" is "a college athlete who is kept out of varsity competition for a year in order to extend eligibility." *See Redshirt*, Merriam-Webster, https://www.merriam-webster.com/dictionary/redshirt (last visited Feb. 23, 2026).

[2] Bradley was indicted on thirteen felony counts for his role in the hazing incident at NMSU; he eventually pled guilty to two counts of disorderly conduct in exchange for testifying against his former-teammate codefendants.

2

waiver[3] of the Five-Year Rule[4] relating to his 2023–24 season at Nicholls State. The waiver request asserted that Bradley met the criteria for an extension of eligibility waiver because (1) California State Fullerton redshirted him during the 2019–20 season, and (2) Bradley was denied an opportunity to participate in the 2023–24 season at Nicholls State because of circumstances beyond his control, citing his withdrawal from the basketball team relating to the NMSU hazing allegations.

---

[3] The NCAA waiver bylaw states:

A waiver of the five-year period of eligibility is designed to provide a student athlete with the opportunity to participate in four seasons of intercollegiate competition within a five-year period. This waiver may be granted, based upon objective evidence under the following circumstances:

   (a) [1] The student-athlete did not use a season of competition due to an institutional decision to redshirt the student-athlete; [2] the student-athlete was listed on the institution's squad list and was eligible for competition during the segment of the season that ends with the NCAA championship; and [3] the student-athlete was deprived of the opportunity to participate in intercollegiate competition in one other season due to circumstances beyond the control of the student-athlete or the institution. (The use of this provision is limited to one time in a student-athlete's period of eligibility)

NCAA Bylaw 12.8.1.7.1.

[4] The Five-Year Rule states that "[a] student-athlete shall complete the student-athlete's [four] seasons of participation within five calendar years from beginning of the semester or quarter in which the student-athlete first registered for a minimum fulltime program of studies in a collegiate institution . . . ." NCAA Bylaw 12.8.1.

3

On August 12, 2025, the NCAA denied Bradley's waiver request, determining that it: (1) did not "provide objective documentation [that Bradley] was unable to compete for a reason outside his or an institution's control" for the 2023 season at Nicholls State, and (2) did not "demonstrate extraordinary circumstances existed to warrant approving the waiver."

On August 26, 2025, BCU requested that the NCAA reconsider its denial of Bradley's waiver, providing additional statements from his lawyer, mental health counselor, and deacon. On November 14, 2025, the NCAA again denied the waiver request, determining that Bradley's "2023 fall semester [at Nicholls State] is not considered a denied participation opportunity given [Bradley] decided not to participate at an institution that sponsored his sport, in part due to pending legal matters, which is a legislated circumstance within his control." BCU did not appeal that determination, which NCAA rules would have allowed. As a result, the 2025–2026 season began without Bradley on BCU's roster.

On November 24, 2025, Bradley filed a one count complaint, claiming that the NCAA had violated the Florida Antitrust Act; it also sought to "enjoin[] the NCAA from continuing to violate the Florida Antitrust Act and an order declaring that he is entitled to play Division I college basketball for the 2025–2026 season." Bradley alleged that "the NCAA ha[d] arbitrarily and capriciously refused to waive its Five-Year Rule (under NCAA Bylaw 12.8.1) as it related to [Bradley's] participation in the Fall 2023 semester at Nicholls State, despite the extraordinary circumstances beyond his control." The complaint further alleged that, without relief, Bradley would be deprived of $192,000 in Name, Image, and Likeness ("NIL") compensation from BCU and would "suffer irreparable harm to his competitive development and prospects to play professional basketball following the 2025–2026 season."

After an evidentiary hearing, the trial court on January 9, 2026, granted Bradley's temporary injunction, ordering the NCAA to grant Bradley's waiver, allowing him to compete for BCU in what remained of the 2025–26 basketball season. In its order, the trial court presented a brief two-paragraph analysis, stating,

Competition in a sport cannot be supplanted by any legal remedy. This Court lacks the ability to adequately evaluate [Bradley's] contribution to the team or the effects of inactivity on his NBA recruitment opportunities. The Court therefore finds that there is no adequate remedy at law and that the injury to [Bradley] outweighs any possible harm to [the NCAA].

Additionally, the Court finds that [Bradley] has a likelihood of success on the merits of his antitrust complaint in that [the NCAA] is the sole arbiter of who is eligible to compete in college sports, for which, as [the NCAA] contends, athletes have no other recourse.

The NCAA appealed the trial court's ruling. It simultaneously moved to expedite this appeal and to stay the trial court's order, both of which were granted.

**II.**

It is well-established that "[a] temporary injunction may be entered if the party seeking the injunction establishes the following criteria: (1) the likelihood of irreparable harm; (2) the unavailability of an adequate remedy at law; (3) a substantial likelihood of success on the merits; and (4) considerations of the public interest." *Yardley v. Albu*, 826 So. 2d 467, 470 (Fla. 5th DCA 2002). "A movant's '[f]ailure to prove any one of the four elements mandates denial of the motion for temporary injunction.'" *Wayne's Aggregate & Materials, LLC v. Lopez*, 391 So. 3d 633, 636 (Fla. 5th DCA 2024) (quoting *Holland M. Ware Charitable Found. v. Tamez Pine Straw LLC*, 343 So. 3d 1285, 1289 (Fla. 1st DCA 2022)).

Under Florida Rule of Civil Procedure 1.610, a "trial court must provide '[c]lear, definite, and unequivocally sufficient factual findings to support each of the four elements.'" *Wayne's Aggregate*, 391 So. 3d at 636 (quoting *Housman v. Housman*, 370 So. 3d 1006, 1009 (Fla. 5th DCA 2023)). Due to the nature of a judicial injunction, "[s]trict compliance with Florida Rule of Civil Procedure 1.610 is required because a temporary injunction is an extraordinary remedy that Florida courts should sparingly issue." *Wayne's Aggregate*, 391 So. 3d at 636 (internal citation and

5

quotations omitted). Importantly, "[a] mandatory injunction should be issued in only the rarest of circumstances where the rights are clear and certain." *Blue Earth Sols. v. Fla. Consol. Props., LLC*, 113 So. 3d 991, 992 (Fla. 5th DCA 2013). Moreover, when issuing a temporary injunction, "[r]ule 1.610 requires that the trial court's *order* 'specify the reasons for entry [and] describe in reasonable detail the act or acts restrained without reference to a pleading or another document.'" *Wayne's Aggregate*, 391 So. 3d at 626 (quoting Fla. R. Civ. P. 1.610(c) (emphasis added)).

The trial court's order granting the temporary injunction fails for multiple reasons. First, the trial court's written order fails to set forth sufficient factual findings to support each of the four elements necessary to grant the issuance of a temporary injunction. *See Dickerson v. Senior Home Care, Inc.*, 181 So. 3d 1228, 1229 (Fla. 5th DCA 2015) (holding that the "trial court's order does not sufficiently specify the reasons for the entry of the temporary injunction"). The trial court's *written order* must specify the reasons for entry. *Id.* ("A trial court must delineate factual findings to support each of the four criteria that must be established in order to issue the temporary injunction."); *see also Williams v. Cook ex. rel. Advanced Orthopedics, P.A.*, 50 Fla. L. Weekly D587c (Fla. 5th DCA Mar. 7, 2025), No. 5D2024-1531, 2025 WL 728266, at *3 (Fla. 5th DCA Mar. 7, 2025) ("If the four criteria are met, the court must make clear and sufficient factual findings *in the order* granting the injunction to support each of the four elements." (emphasis added)); *Housman*, 370 So. 3d at 1009 (stating that "[i]f a motion for temporary injunction meets the four criteria, the court must make findings in the order granting the injunction as to each of the criteria").

In sharp contrast to these legal requirements, the injunction order is perfunctory and conclusory: a few pages with only four sentences of purported analysis in a complex antitrust case. At the end of its analysis section, the trial court says it arrived at its decision "for the reasons stated on the record," which is inadequate and not a substitute for compliance with the procedural rule and precedent. *See Wayne's Aggregate*, 391 So. 3d at 636. Moreover, the order's limited factual findings are unsupported by competent substantial evidence, which is necessary as to each of the elements but lacking in the record. *Fla. Ass'n of Realtors v. Orange County*,

6

350 So. 3d 115, 123 (Fla. 5th DCA 2022) ("The injunction's proponent must establish each element with competent substantial evidence.").

Second, the trial court's four-sentence legal analysis is deficient, particularly in a fact-intensive antitrust case. It is well-established that "reciting legal aphorisms or parroting the essential criteria of a temporary injunction and proclaiming that they have been established . . . will not suffice." *Yardley*, 826 So. 2d at 470. An order granting a temporary injunction which does "little more than state that the movant had satisfied each prong of the test . . . is facially insufficient." *Eldon v. Perrin*, 78 So. 3d 737, 738 (Fla. 4th DCA 2012). Here, the trial court's analysis falls far short of what is legally required by making far-reaching legal conclusions with little more than a few conclusory statements.

Third, the trial court's order erred as to the likelihood of irreparable harm and the unavailability of an adequate remedy at law. The order placed dispositive weight on the notion that Bradley, despite his track record over the course of his six-year collegiate career, had a right to compete on the BCU basketball team and that his contribution to the team and his NBA prospects outweighed all else. The evidence established, however, that if Bradley were to prevail on his antitrust claim, following a full trial, he would be granted eligibility for another year; he conceded as much. Bradley failed to present any evidence of how he would be irreparably injured if he were not allowed to play at BCU during this season. For this reason, it cannot be concluded that Bradley is irreparably harmed by awaiting trial, which could result in a potential additional year of eligibility.

To the contrary, the NCAA—a private organization—could have substantial harm to its intercollegiate sports programs by ineligible players being judicially granted eligibility status to which they are not entitled; the organization's purpose could be undermined if courts interject their own notions of fair play. In addition, Bradley's $192,000 NIL contract with BCU is a purely financial one; any claimed loss of NIL payments due to his lack of eligibility is between him and the college and amounts to a purely economic loss that could be remedied by money damages. *See Barclays Am. Mortg. Corp. v. Holmes*, 595 So. 2d 104, 105 (Fla. 5th

DCA 1992) (finding "irreparable harm does not exist where the potential loss is compensable by money damages"); *see also Tamez Pine Straw*, 343 So. 3d at 1289 ("Irreparable injury is defined as injury that cannot be cured by money damages.").

Fourth, Bradley failed to establish a substantial likelihood of success on the merits of his claim under the Florida Antitrust Act, which complements and is interpreted in accord with federal antitrust laws. § 542.32, Fla. Stat. (2025) ("It is the intent of the Legislature that, in construing this part, due consideration and great weight be given to the interpretations of the federal courts relating to comparable federal antitrust statutes.").

Bradley's claim is that the NCAA's regulation and control over intercollegiate sports amounts to an illegal "contract, combination, or conspiracy in restraint of trade or commerce." *Id*. § 542.18. To establish a violation, a claimant must plead and prove under a "rule of reason" analysis that an alleged restraint on balance results in anticompetitive effects that outweigh pro-competitive effects. *St. Petersburg Yacht Charters, Inc. v. Morgan Yacht, Inc.*, 457 So. 2d 1028, 1031 (Fla. 2d DCA 1984) ("'Rule of reason' antitrust violations require proof relating to anticompetitive effects of the conduct alleged.").

The Supreme Court has provided a brief but thorough overview of how courts evaluate alleged restraints on trade:

> Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for what we have described as a "rule of reason analysis." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Standard Oil Co. of N. J. v. United States*, 221 U.S. 1, 60–62 (1911). That manner of analysis generally requires a court to "conduct a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition." [*Ohio v. Am. Express*, 585 U.S. 529, 541 (2018).] Always, "the goal is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."

*Nat'l Coll. Athletic Ass'n v. Alston*, 594 U.S. 69, 81 (2021) (citation modified). As indicated, rule of reason analysis requires much more than showing that a restraint affects one competitor; instead, a detailed assessment of the relevant market, market power, and the overall effects on competition itself is required.

Here, the trial court did not conduct a rule of reason analysis; it did not "conduct a fact-specific assessment of market power and market structure" or assess the challenged restraint's "actual effect on competition." *Alston*, 594 U.S. at 81. The written order has no findings defining the relevant market or how the Five-Year Rule has an overall anticompetitive effect. Instead, the trial court determined that Bradley was likely to succeed on the merits of his antitrust claim simply because the NCAA "is the sole arbiter of who is eligible to compete in college sports, for which, as [the NCAA] contends, athletes have no other recourse." But every business is the sole arbiter of its own product or service, rendering this statement meaningless. Rather than conduct the requisite market-based antitrust analysis and examine both pro- and anti-competitive effects, the trial court focused instead on the NCAA's application of its Five-Year Rule to one person, Bradley. Little to no effort was made by Bradley or the trial court to undertake the necessary market analysis underlying the rule of reason. For these reasons, this element was not met.

Moreover, although the trial court attempted to transform this single claim antitrust case into multiple unpled claims challenging the fairness of the NCAA's procedures, which was improper, no such showing was made. Indeed, our sibling court in *National College Athletic Ass'n v. Brinkworth*, 680 So. 2d 1081, 1084 (Fla. 3d DCA 1996), concluded in a similar case "that there is no showing that the NCAA's own internal procedures were either inadequate or unfair." Like this case, it stated:

> The NCAA has adopted a procedure which allows a student athlete to apply for a waiver of the five-year rule. Under the NCAA procedure, the university submits a waiver request on behalf of the student-athlete to the eligibility staff. If the staff turns the waiver request down, then the university may submit an appeal on behalf of the student-athlete to the Eligibility Committee.

9

In this case, after a rejection by the Eligibility Committee, the Committee also entertained a request for reconsideration. As we view the matter, these procedures are both adequate and fair.

*Id*. In that case, the student argued that even if the NCAA procedures were fair, the outcome was not, a theme the trial court in this case pursued. But Bradley only raised an antitrust claim, not a generalized "unfairness" claim. As in *Brinkworth*, the fairness issue was not properly raised and "is beyond our province to review. It is up to the NCAA to interpret its own rules, not the judiciary." *Id*.

Fifth, the trial court's order fails to make any mention of the fourth element—considerations of the public interest. Bradley's counsel conceded this point at the emergency hearing this Court held on the motion to stay. This deficiency alone warrants reversal. *See Wayne's Aggregate*, 391 So. 3d at 636 ("[T]he order fails to set forth sufficient factual findings as to *each* of the four elements . . . required to prove to warrant the issuance of the temporary injunction."). Bradley offered no independent proof on this element. Instead, he asserts that the trial court's finding of a substantial likelihood of success on his antitrust claim "naturally supports" the public interest; this argument, however, would eliminate the public interest factor altogether and is thereby insufficient.

For all the foregoing reasons, the temporary injunction is facially invalid and its findings unsupported by competent substantial evidence; it is thereby quashed.

## III.

Finally, the transcript of the proceedings below demonstrates that the trial judge favored Bradley by raising claims and issues that Bradley did not plead and advocating positions adverse to the NCAA on these unpled matters, essentially acting as additional counsel for Bradley. In characterizing the NCAA's regulatory authority, he interjected his view that the NCAA is the "judge, jury, and executioner" akin to King John, whose conduct led to the Magna Carta. Transcript at 1026–27 (THE COURT: "It was King

10

John, wasn't it? Wasn't it because he was pretty much the judge, the prosecutor, and the executioner? Isn't that one of the main reasons why the Magna Carta came into being? . . . And isn't that what the NCAA is . . . is pretty much the prosecutor, the judge, the jury, and the executioner?"). The totality of this conduct raises a serious concern as to judicial partiality. *See* Fla. Code Jud. Conduct, Canon 3. In an abundance of caution, therefore, a different judge shall be assigned to the case on remand to preclude any appearance that the proceedings are anything other than fair and impartial. *See Gillespie v. State*, 392 So. 3d 239, 241 (Fla. 5th DCA 2024) (ordering sua sponte reassignment to another judge on remand); *Carrington Mortg. Servs., LLC v. Nicolas*, 343 So. 3d 605, 611 (Fla. 3d DCA 2021) (same).

INJUNCTION QUASHED; REVERSED and REMANDED.

EDWARDS, J., concurs.
EISNAUGLE, J., concurs in part, and dissents in part, with opinion.

_____

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

_____

11

EISNAUGLE, J., concurring in part, and dissenting in part, with opinion.

I agree that the temporary injunction was entered in error. However, I conclude only that the evidence and the trial court's findings are insufficient to establish a likelihood of success on the merits. *See Yardley v. Albu*, 826 So. 2d 467, 470 (Fla. 5th DCA 2002). I do not reach the other issues discussed by the majority.[1]

The "rule of reason" applies to the anti-trust violation alleged in this case. § 542.18, Fla. Stat. (2025). Yet, Bradley offered no evidence below—and the trial court made no finding—that the alleged restraint had any effect on the market itself. *Parts Depot Co., L.P. ex rel. Parts Depot Co., Inc. v. Fla. Auto Supply, Inc.*, 669 So. 2d 321, 326 (Fla. 4th DCA 1996) (explaining that the rule of reason requires a showing that "exclusion from the market did affect or was intended to affect the price or supply of goods in that market"); *see also Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016) ("Applying the rule of reason, we ask whether Procaps has shown that the alleged restraint has had an anticompetitive effect on the market."). "It is not enough to allege

---

[1] The NCAA argues that Bradley will not suffer irreparable harm. But the NCAA's initial brief does not clearly explain how participating *next* season is an adequate remedy for the denial of a legitimate interest in competing *this* season. The NCAA also argues that the Dormant Commerce Clause prohibits application of Florida's statute altogether but fails to answer several key questions to establish this claim. Therefore, I do not reach the substance of these issues because the NCAA's initial brief is not sufficient to demonstrate error on appeal. *Lynn v. City of Ft. Lauderdale*, 81 So. 2d 511, 513 (Fla. 1955) ("It is elementary that when a decree of the trial court is brought here on appeal the duty rests upon the appealing party to make error clearly appear.").

that [Bradley was] injured; there must be . . . harm to competition in general."  669 So. 2d at 326 (citation omitted).[2]

That said, I dissent from the majority's instruction that "a different judge shall be assigned to the case on remand."  The NCAA did not argue on appeal that the trial judge improperly raised issues in the proceedings below.  Nor did the NCAA ask that we order reassignment of the case.  We should not raise the issue on its behalf.  *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation.").  While I take no position on the propriety of the trial court's activity below, in fairness to the trial judge, I note that the reference to the "judge, jury, and executioner" was simply a way to describe the NCAA's exclusive control over athlete eligibility and eligibility waivers.  This commentary does not indicate partiality.

---

[2] Nor did the evidence, or the trial court's findings, address the public interest.